**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ROSA M. DELACRUZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:14-CV-03869-BH |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of reassignment dated January 30, 2015 (doc. 17), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Brief in Support of Claim*, filed April 16, 2015 (doc. 25), and *Defendant's Brief*, filed May 18, 2015 (doc. 26).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND

### A.   Procedural History

Rosa M. Delacruz (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income under Title XVI of the Social Security Act. (R. at 17-31.)  On April 12, 2011, Plaintiff applied for supplemental income, alleging disability beginning on April 1, 2010, due to physical impairments. (R. at 158.) Her application was denied initially on October 19, 2011, and upon reconsideration on February 15, 2012.  (R. at 70, 82.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing on May 7, 2013. (R. at 32-62.)  On June 30, 2012,

the ALJ issued her decision finding Plaintiff not disabled. (R. at 17-31.) Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on September 14, 2013. (R. at 1-8.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.  Factual History**

    **1.  Age, Education, and Work Experience**

Plaintiff was born on November 28, 1962, and was fifty years old at the time of the hearing. (R. at 36.) She attended school through the ninth grade in Mexico and was unable to communicate in English. (R. at 34, 37.) Her prior work experience included housekeeping and baking at Wal-Mart and bench assembler and hand packager at Dixie Staffing and Legacy Staffing. (R. at 38-39, 42.)

    **2.  Medical Evidence**

On November 16, 2007, Plaintiff experienced swelling and puffiness in the anteromedial aspect of her right ankle. (R. at 528.) X-rays of her right ankle appeared "fairly normal." (*Id.*) Sascha D. Taghizadeh, M.D., recommended anti-inflammatories and an ankle brace. (*Id.*)

On January 11, 2008, Plaintiff saw Michael D. Vanpelt, D.P.M., for a follow-up on her "right tibialis anterior tendinitis." (R. at 543.) She had full range of motion "both passively and actively, at the knee from 0 to about 140, and in the ankle 30 degrees of dorsiflexion and 60 degrees of plantar flexion as well as excellent great toe flexion and extension." (*Id.*) Although Plaintiff had 5/5 strength, Dr. Vanpelt noted "reproducible pain on dorsiflexion and knee flexion." (*Id.*) He advised her to continue taking anti-inflammatories and to alternate between hot and cold packs to help with inflammation. (*Id.*) On February 8, 2008, Plaintiff followed-up with Dr. Vanpelt for X-rays, which displayed "normal foot structure" and "no fracture or dislocation." (R. at 551.) She was also "pain

2

free" and exhibited 5/5 strength. (*Id.*)

In March 2008, Plaintiff underwent a hysterectomy. (R. at 662, 809.) She had a follow-up appointment with the Department of Gynecology at Parkland Health and Hospital System (Parkland) on May 1, 2008. (R. at 591.) Plaintiff complained of right lower extremity pain, specifically in her right buttock, which radiated down her leg and around her labia. (*Id.*) The physician noted that the cuff was well-healed with no inflammation. (*Id.*) She diagnosed Plaintiff with sciatic nerve pain and advised her to consider re-operation for stitch removal. (*Id.*)

On October 22, 2008, Plaintiff had an X-ray of her pelvis and lateral hip performed by Gerald W. Dietz, M.D. (R. at 656.) The images were normal. (*Id.*) Because of persistent pain in her right hip and right back, however, Plaintiff received injections into her right greater trochanter bursa on December 19, 2008. (R. at 799-800.) She was injected with 80 milligrams of Kenalog and 6 milliliters of 0.25% Marcaine at the Parkland Pain Clinic and was instructed to continue taking gabapentin as well as hydrocodone. (R. at 800.)

On June 1, 2009, Plaintiff opted to have the suture removed following her hysterectomy. (R. at 808-10.) She persistently reported that pain radiated from her right buttock to the back of her right leg. (R. at 809.) Her physician noted that an area of granulation tissue at the right to midline area of the cuff was "exquisitely tender" when palpated, but opined that the suture may or may not be the source of her pain. (*Id.*) Plaintiff proceeded to have granulation tissue and the Ethibond suture removed. (*Id.*)

During a follow-up to the suture removal surgery on August 25, 2009, a CT scan showed a retroperitoneal cystic structure. (R. at 662.) Another CT scan of her abdomen/pelvis on April 29, 2010, showed the cystic structure was still there. (R. at 663-64.) There had been no change of the

structure. (*Id.*) The lung bases, spleen, pancreas, gallbladder, adrenals and kidneys were unremarkable. (*Id.*)

On October 1, 2010, Plaintiff had an MRI of the lumbar spine. (R. at 302-03.) No significant abnormality of the lumbar was seen. (R. at 303.)

Plaintiff returned to the Pain Clinic at Parkland on December 8, 2010, for chronic lower back and hip pain. (R. at 833.) Ahmad Elsharydah, M.D., noted that the pain presented was the "same exact distribution, quality, severity, timing alleviating/provocative factors and radiation as when the patient was last seen in clinic in 2008 prior to her injection." (*Id.*) Plaintiff asked for another injection. (*Id.*) At the time, she was taking hydrocodone, ibuprofen, and gabapentin. (*Id.*) An injection appointment was scheduled for March 2011. (R. at 851.)

Plaintiff began a course of physical therapy treatment on February 17, 2011, which was to last three months. (R. at 849.) The therapy targeted pelvic floor dysfunction and posterior femoral cutaneous nerve neuralgia. (R. at 850.)

Plaintiff received right sacroiliac joint and right greater trochanter bursa injections on May 4, 2011. (R. at 352, 851, 854-61.) The injections did not positively impact her as much as the first injection. (R. at 871.)

On May 16, 2011, Plaintiff reported burning pain in her left foot, and it hurt to stand on it. (R. at 862.) She also reported that she could not work due to pain. (*Id.*) The left foot revealed decreased pulses. (*Id.*) A vascular study of the left foot showed "no evidence of arterial insufficiency" on both the right and left lower extremities. (R. at 671, 863.) It also showed no evidence of "hemodynamically significant stenoses or occlusion." (*Id.*)

On May 24, 2011, Plaintiff had an MRI of her abdomen/pelvis. (R. at 668-69.) Travis Glenn

4

Browning, M.D., viewed the left retroperitoneal cyst but noted that it was "without solid component, calcification, abnormal enhancement, or associated inflammation which is relatively stable going back to 2008. . . . [and that] [c]ontinued surveillance is of questionable utility in the absence of new symptoms." (R. at 669.) All other major organs viewed in the MRI were normal. (*Id.*)

Plaintiff had an urogynecology department follow-up on June 2, 2011. (R. at 864.) She reported that she occasionally could not bear full weight on her right lower extremity nor lie on her right side. (*Id.*) She had previously received pelvic floor therapy and reported mild improvement. (*Id.*) Jennifer McNabb, M.D., referred her to physical therapy for a "refresher course" as well as occupational therapy and advised her to continue pain management visits. (R. at 865.)

On June 20, 2011, Plaintiff returned to the Pain Management Clinic at Parkland for a follow-up on the injections she received in May 2011. (R. at 869.) She reported that her pain did not go away and described it as achy and constant. (*Id.*) She was advised to increase her gabapentin gradually from three to six caps daily over the next fifteen days. (R. at 870.) Plaintiff returned on July 21, 2011. (R. at 874.) She described pain in her right lower buttock, right posterior thigh, and right perineum as a "5" on a scale of 0-10. (*Id.*) Exacerbating factors included sitting and walking (*Id.*) Examination of her back revealed no tenderness or spasm. (R. at 875.)

State agency medical consultant, Gerald H. Stephenson, Ph.D., performed a psychological evaluation on July 21, 2011. (R. at 403-06.) He observed that Plaintiff walked "haltingly with a cane," her "fine motor control appeared to be fair to poor," and her speech was "about 85 percent understandable." (R. at 403.) Plaintiff told Dr. Stephenson that she cared for her personal hygiene and grooming but performed no household chores. (R. at 404.) She sat on the patio occasionally but did not go anywhere outside the home. (*Id.*) Dr. Stephenson opined that she would "continue to

5

suffer from depression as a component of her pain disorder" and would "probably need to be protected from a tendency to give up and take her own life." (*Id.*)

On August 12, 2011, Plaintiff received a right pudendal nerve block. (R. at 881.) She was injected with a total of 40 milligrams of Kenalog with 1 cubic centimeter of 0.25% bupivacaine plain. (R. at 882.) Gerald Matchett, M.D., noted upon X-ray examination that her spine was "grossly normal." (*Id.*)

The Cooperative Disability Unit of Dallas met with Plaintiff on September 29, 2011, to further investigate her claim of disability. (R. at 442-449.) She recited from memory her social security number, date of birth, place of birth, and telephone number (R. at 445.) She did not have a bus pass or use any form of public transportation and owned a 1998 Mazda registered in her name. (R. at 446.) She shopped for groceries about once a week and paid all household bills (*Id.*) She suffered from pain due to a previous unspecified operation. (*Id.*) The investigators noted that she was pleasant and cooperative, maintained good eye contact while answering questions, and responded timely, appropriately, and independently. (R. at 447.) She had no apparent difficulty maintaining her focus or concentration, and she appeared suitably clothed with good hygiene. (*Id.*) She neither displayed nor verbalized any indication of pain or discomfort (*Id.*) She walked with a normal gait but wore a knee brace on her right knee. (*Id.*)

State agency medical consultant, Scott Spoor, M.D., performed a physical residual functional capacity (RFC) assessment on October 18, 2011. (R. at 468-475.) He reviewed Plaintiff's medical records, including the CDI report and Dr. Stephenson's report. He diagnosed her with right greater trochanteric bursitis and morbid obesity. (R. at 468.) He found that she could lift and/or carry fifty pounds occasionally, twenty-five pounds frequently, and stand, walk, or sit for about six hours in

6

an eight-hour workday. (R. at 469.) She was unlimited in her ability to push and/or pull. (*Id.*) She had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 470-72.) Dr. Spoor opined that her alleged limitations were partially supported by medical and other evidence. (R. at 473.)

On January 24, 2012, Dr. Matchett wrote in his clinic notes that Plaintiff was able to heel walk, toe walk, and squat without any great difficulty. (R. at 909.) He was "unable to get patellar or Achilles reflexes" but noted that there was no "obvious gross strength deficit." (*Id.*) Dr. Matchett recommended a relatively conservative course, such as physical therapy and taking Gabapentin. (*Id.*) He advised Plaintiff to exercise caution regarding daily nonsteroidal anti-inflammatory use and intermittent use of hydrocodone, but "really [did] not have much else to recommend." (*Id.*)

On March 1, 2012, Plaintiff visited the urogynecology department at Parkland complaining of right leg pain. (R. at 915.) Mary Sullivan, M.D., reported that Plaintiff ambulated slowly but without difficulty and had 4/5 muscle strength. (*Id.*) Dr. Sullivan told her to continue with gabapentin and ibuprofen for pain as well as pelvic floor physical therapy. (*Id.*)

Due to pain in her feet, Plaintiff had an X-ray on March 9, 2012. (R. at 674-76.) Both feet were normal. (*Id.*)

Plaintiff attended pelvic floor physical therapy as directed by Dr. Sullivan on April 5, 2012. (R. at 920-21.) She was given instructions on techniques and exercises to reduce pain. She missed her follow-up appointment on May 2, 2012, due to lack of transportation. (R. at 922.) She was also discharged from physical therapy that day because "patient ha[d] plateaued." (*Id.*)

Plaintiff had surgery to remove the cyst in her left retroperitoneal area on December 28, 2012. (R. at 958-61.) Mark J. Watson, M.D., informed her that "removal of what appeared to be a

benign-appearing cyst . . . may not alleviate her symptoms. (R. at 960.) During the operation, "200 cubic centimeters of benign-appearing clear cystic fluid was aspirated laparoscopically, and the cyst was completely excised from the surrounding retroperitoneal tissue, as well as off of the lateral posterior border of the mid descending colon." (R. at 959.) She followed-up on January 10, 2013, with Reagan Ross, M.D. (R. at 969.) Dr. Ross characterized the procedure as "uneventful and cyst benign." (*Id.*)

Plaintiff's gynecologist completed a "medical source statement of ability to do work-related activities" similar to a physical RFC assessment on April 16, 2013. (R. at 987-990.) The gynecologist found that Plaintiff could only carry less than ten pounds frequently and occasionally, needed a hand-held assistive device for ambulation, and had to alternate between sitting and standing to relieve pain. (R. at 987-88.) Plaintiff could only occasionally climb, balance, and stoop, but never kneel, crouch, or crawl. (R. at 988.) She was limited in her lower extremities as to pushing and/or pulling, but had no manipulative, visual, communicative, or environmental limitations. (R. at 989-990.) The gynecologist based her opinion on "chronic lower extremity pain/weakness after surgical procedure due to right posterior femoral cutaneous neuralgia." (R. at 988.)

### 3. Hearing Testimony

On May 7, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 32-62.) Plaintiff was represented by an attorney. (R. at 32.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was born on November 28, 1962, was 50 years old, 4 feet 7 inches tall, and weighed 182 pounds. (R. at 37.) She lived with her husband and "a 16 year-old-boy [sic] who goes to school." (*Id.*) She completed school through the ninth grade in Mexico. (*Id.*) She had

8

not earned a GED or received any vocational training in the United States. (*Id.*)

Plaintiff last worked around April 1, 2010, at a Wal-Mart store. (R. at 38.) She initially did housekeeping for about three months but eventually moved to the bakery department because of her need to do light work. (*Id.*) In the bakery department, she placed the bread on trays, but someone else baked it. (*Id.*) Plaintiff worked at Wal-Mart for less than a year; she stopped working because [her right] leg was hurting a lot and [she] could not bend over to pick up things." (R. at 47.) Plaintiff experienced pain "on [her] leg, waist area, and [her] back." (*Id.*)

Before working at Wal-Mart, Plaintiff worked with Dixie Staffing. (R. at 39.) It sent her to different jobs, only some of which she was able to do. (*Id.*) She also worked at Legacy Staffing, a company "that use[d] different type[s] of people for different jobs." (R. at 42.) When asked for clarification by the ALJ, Plaintiff stated that she "check[ed] the product as [it came] out of the machine, to place the parts in a little machine so that they can be packed . . . and plac[ed] items in the box." She was put in a job one day and in a different job the next. (R. at 43.)

Plaintiff had a hysterectomy in 2008. (R. at 48.) Since then, she had been dealing with pain in her leg, back, and hips. (*Id.*) She has also received injections and additional surgeries. Plaintiff had experienced headaches for more than five years. (R. at 49.) She stated that doctors found a benign tumor behind her brain but told her it "would be best not to touch it." (R. at 50.) The headaches were due to the pressure of the tumor, and she had been taking ibuprofen for about five years to address the inflammation.

Plaintiff stated that she previously took high blood pressure medication and was taking medication for depression, anxiety, and insomnia. (R. at 51.) The medications for depression and anxiety helped her only briefly. (*Id.*) Those medications also had side effects, such as stomach pain,

9

diarrhea, dry mouth, sleepiness, and constipation. (R. at 54.)

Plaintiff had difficulty concentrating and was unable to finish tasks. (R. at 52.) She could not do chores around the house because she could not sit down or stand for very long. (*Id.*) She could sit for fifteen to twenty minutes at the most. (R. at 53.) Plaintiff could stand for twenty to twenty-five minutes at most. (*Id.*) She could not grab a gallon of milk because she had a broken hand. (*Id.*) She also could not drive due to anxiety and because she could not sit for a long period of time. (*Id.*)

  b.  *VE's Testimony*

The VE classified Plaintiff's past relevant work as a housekeeper (323.687-014, light, unskilled, SVP: 2), bench baker (520.384-010, medium, semi-skilled, SVP: 6), bench assembler (706.684-022, light, unskilled, SVP: 2), and hand packager (920.587-018, medium, unskilled, SVP: 2). (R. at 56.)

The ALJ asked the VE to opine whether Plaintiff's past relevant work could be performed by a hypothetical person of Plaintiff's age, education, and work experience, who could lift and/or carry up to 50 pounds occasionally, 25 pounds frequently, and could sit, stand, and/or walk up to six hours each in an eight-hour workday and could complete detailed but not complex tasks. (R. at 57-58.) The VE opined that all of Plaintiff's past work could be performed. (R. at 58.)

The ALJ also asked if the hypothetical person could perform any other work. (R. at 58.) The VE opined that other work could also be performed, including a dining room attendant (311.677-018, medium, unskilled, SVP: 2), with 6,300 jobs in Texas and 72,400 in the national economy; kitchen helper (318.678-010, medium, unskilled, SVP: 2), with 9,000 jobs in Texas and 137,500 in the national economy; and laundry worker II (361.685-018, medium, unskilled, SVP: 2), with 3,300

jobs in Texas and 40,000 in the national economy. (R. at 58-59.)

The ALJ added to the hypothetical that the individual could occasionally kneel, crouch, crawl and occasionally climb ramps and stairs, but not climb ladders, ropes or scaffolds. (*Id.*) The VE opined that kitchen helper could not be performed because it would require frequent stooping and crouching, but all of the past work would be available. (R. at 58-59.) The VE also opined that the hypothetical person could also work as a linen room attendant (222.387-030, medium, unskilled, SVP: 2), with 3,200 jobs in Texas and 42,200 in the national economy. (R. at 59.)

C. **ALJ's Findings**

The ALJ issued her decision denying benefits on June 20, 2013. (R. at 11-31, 17.) At step one,[1] she found that Plaintiff did not engage in substantial gainful activity since April 12, 2011, the protective filing date (R. at 19.) At step two, she found that Plaintiff had the following severe impairments: right sacroiliitis, right greater trochanter bursitis, bilateral plantar fasciitis, sciatic neuralgia, obesity, major depressive disorder, anxiety disorder, not otherwise specified. (*Id.*) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*) Next, the ALJ determined that Plaintiff had the RFC to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently.[2] (R. at 20.) She could sit, stand, and/or walk six hours each in an eight-hour workday and could also occasionally kneel, crouch,

---

[1] The references to steps refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

[2] The ALJ's decision states that the "claimant has the residual functional capacity to lift and/or carry twenty-five pounds occasionally and fifty pounds frequently." (R. at 20.) In the hearing, however, the ALJ questioned the VE regarding the RFC to lift and/or carry "50 pounds occasionally, 25 pounds frequently." (R. at 57.)

11

climb ramps and stairs, but never climb ropes, ladders, or scaffolds. (R. at 21.) Plaintiff could also perform detailed but not complex tasks. (*Id.*)

At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a bench assembler and a hand packager. (R. at 25.) The ALJ also found that there were other jobs that she could perform. At step five, the ALJ found that Plaintiff could perform work as a dining room attendant, laundry worker, or linen room attendant. (R. at 26.) The ALJ concluded that she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (*Id.*) Therefore, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since April 12, 2011, the date of protective filing. (*Id.*)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a

conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* A court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436 & n.1.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issues for Review**

Plaintiff presents one issue for review:

Whether the ALJ's RFC finding is supported by substantial evidence.

(doc. 25 at 2.)

**C.** **RFC Assessment**

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence because "the ALJ failed to include all limitations relating to Plaintiff's impairments." (doc. 25 at 3.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2012). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the

ALJ's decision when substantial evidence supports it, even if it would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). A reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations and "careful consideration of the entire record," the ALJ determined that she had the RFC to lift and/or carry twenty-five pounds occasionally and fifty pounds frequently; sit, stand, and/or walk for six hours each in an eight-hour workday; occasionally kneel, crouch, and crawl, and can occasionally climb ramps and stairs but can never climb ropes, ladders, or scaffolds; and can perform detailed but not complex tasks. (R. at 20-21.)

In considering the Plaintiff's symptoms, the ALJ followed a two-step process. (R. at 21.) First, the ALJ determined whether there was an underlying medically determinable physical or mental impairment, or combination thereof, that could reasonably be expected to produce Plaintiff's pain or other symptoms. (*Id.*) At this first step, the ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.*) Second, the ALJ evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms

16

to determine the extent to which they limited her functioning. (*Id.*)

The ALJ considered important that Plaintiff derived significant relief lasting one year from an epidural steroidal injection in the right sacroiliac joint and subsequently did not seek pain management treatment between December 2008 and October 2010. (R. at 23.) The ALJ also noted that "with inconsistent attendance, [Plaintiff still had] good response to physical therapy," even though she had not completed it. (*Id.*) Likewise, despite continued complaints of pain in her right leg, lower back, and buttock, numerous physical examinations, MRIs, and CT scans found no abnormalities. (R. at 303, 649, 655-56, 674-76, 875, 882, 909.)

Additionally, the ALJ emphasized the inconsistency in the treatment noted and medical records and how Plaintiff presented herself to the state agency medical consultants and third parties. (*See* R. at 23-25) ("This minimal treatment for sciatic neuralgia, sacroiliitis, and bursitis is inconsistent with the gait abnormality [Plaintiff] presented to the consulting psychologist and CDI investigator" and "[t]he minimal physical findings identified by [Plaintiff's pain management specialist, as well as the recommended conservative course of treatment, does not support this degree of limitation, and therefore the [ALJ] accord[ed] this opinion little weight."). However, she "accorded [the opinion of the state agency medical consultant who found that Plaintiff could perform medium work] great weight, as it [was] well supported by the treatment records that show[ed] good response to conservative treatment." (R. at 24.) As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole.

As discussed, the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are

17

non-severe. *See* 20 C.F.R. § 404.1545(a)(3). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c);SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *accord Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 (2002) and SSR 96–8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.' "). SSR 96-8p distinguished between what the ALJ must consider and what the ALJ must include in her written decision. The ALJ's narrative discussion shows she applied the correct legal standards and considered all of the relevant evidence in determining Plaintiff's RFC.

Plaintiff argues that the ALJ's physical RFC finding is not supported by the substantial evidence of the record, which demonstrates that she "is unable to perform a full range of light work." (doc. 25 at 4.) She argues that the ALJ failed to include a sit/stand option in the RFC. (*Id*. at 4-5.)

In determining Plaintiff's physical limitations, the ALJ gave due consideration to medical and lay opinions about the intensity, persistence, and severity of her conditions and their effects on her ability to function. The ALJ specifically referenced the July 2011 of consulting psychologist, Dr. Stephenson (R. at 21, 403-06); the October 2011 CDI report (R. at 22-23, 442-449.); the October 2011 physical RFC assessment done by Dr. Spoor (R. at 24, 468-75); the January 2012 opinion of pain management physician, Dr. Matchett, (R. at 23, 908-10); the April 2013 opinion of Plaintiff's gynecologist, (R. at 24, 987-90); the third party function report done by Plaintiff's husband (R. at 24, 176-83); and Plaintiff's own self-reporting. (R. at 199-206.)

The ALJ accorded Dr. Spoor's October 2011 physical RFC assessment great weight, which opined that Plaintiff was able to lift and/or carry 50 pounds occasionally, 25 pounds frequently, sit

18

and/or stand for about six hours in an eight hour workday, with no limitations as to pushing or pulling. (R. at 24, 468-75.) The ALJ was allowed to give greater weight to Dr. Spoor's RFC assessment than other opinions because she found it to be better supported by the evidence. *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981); (R. at 24.) Accordingly, substantial evidence supports the ALJ's findings on Plaintiff's ability to sit and stand.

Plaintiff next argues that the ALJ failed to consider the combined effects of obesity with other impairments when evaluating her RFC. (doc. 25 at 5 & n.1.) She notes that she has a BMI of 42.3, and "a BMI of forty or more is defined in the National Institutes of Health's Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults, as being 'level III' obesity, which is defined as 'extreme' obesity." (*Id.* at 5.) She also notes that "the combined effects of obesity with other impairments may be greater than might be expected without obesity." (*Id.* at 5 n.1) (citing SSR 02-1p, 2002 WL 34686281, at *6 (S.S.A. Sept. 12, 2002)).

"Obesity can cause limitation of function. . . . An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching." SSR 02-1p, 2002 WL 34686281, at *6 (S.S.A. Sept. 12, 2002). However, "SSR 02–1p does not state obesity necessarily causes any additional function limitations; rather, it provides obesity *can* cause such limitations." *Medrano v. Astrue*, No. A-09-CA-584-SS, 2010 WL 2522202 (W.D. Tex. June 17, 2010) (emphasis in original).

Here, at step two, the ALJ specifically found that Plaintiff's obesity was a severe impairment. (R. at 19, 24.) The written decision shows the ALJ recognized the potential for physical limitation

from obesity and incorporated these limitations into the RFC based on all of the relevant evidence. Accordingly, substantial evidence supports the ALJ's RFC determination.[3]

Because substantial evidence supports the ALJ's RFC determination, remand is not required on this issue.

### III.   CONCLUSION

The Commissioner's decision is **AFIRMED.**

**SO ORDERED** on this 30th day of March, 2016.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[3] To the extent that Plaintiff argues that the ALJ did not consider the combined effects of her obesity at step three (*see* doc. 25 at 5 n.1), this issue was not listed or briefed separately as required by the *Scheduling Order* issued on January 6, 2015 (doc. 14), and is therefore waived. Nevertheless, even if properly raised, obesity was expressly addressed by the ALJ in determining the severity of Plaintiff's impairments. (R. at 19.)